# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

TRADE ANTIQUES, LLC,           \*

     Plaintiff,                \*

     vs.                     \*       CV 211-183

EDWARD R. CANADY,            \*

     Defendant.              \*

## ORDER

On May 20 and 21, 2013, the Court conducted a bench trial in the above-captioned case. After hearing the testimony of eleven witnesses and considering the evidence tendered, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact are more properly characterized as conclusions of law, they should be so construed. Likewise, to the extent that any conclusions of law are more properly characterized as findings of fact, they should be so construed.

## I. FINDINGS OF FACT

The Court hereby makes the following findings of fact:

AO 72A
(Rev. 8/82)

1

## Background Information

The present trial was replete with disputed facts.  The key witnesses disputed almost everything, even details that would seem fairly easily proved, such as whether a house had a bathtub.  Not only did witnesses dispute each other, but also the parties often contradicted themselves.  Because of the remarkable inconsistencies, more so than in most trials, credibility determinations matter in this case.  The undersigned's factual conclusions are aided by the ability to hear the voices and tones of the witnesses and watch their expressions.

1.

All parties agree that Trade Antiques, LLC ("Trade Antiques") is a Florida limited liability company.  Even this fact, which is capable of absolute proof and agreed upon by both sides, was obscured in one document.  For reasons unknown to the Court, Trade Antiques is incorrectly identified as a Georgia limited liability company in the 2003 Warranty Deed by which it obtained the property that is the subject matter of this lawsuit.

2.

Andrew Christie, a native of Scotland, is Trade Antiques' managing member and has, for some time, been Trade Antiques' only member and owner.

AO 72A
(Rev. 8/82)

3.

On March 18, 2003, Trade Antiques acquired a piece of property at 2010 Osborne Road in St. Mary's, Georgia (hereinafter "2010 Osborne Road," the "Property, or "Lot 6"). St. Mary's is in Camden County.

4.

Christie, in his personal capacity, purchased a smaller lot ("Lot 5A") adjacent to the Property. Christie's parents, Victor and Pearl Jankovic, also had an interest in Lot 5A.

5.

Prior to 2009, Christie would split his time between the United States and Scotland.

6.

In early 2009, Christie returned to Scotland to care for his ailing parents. This trip was a more extended visit than his previous trips. Christie did not return to the United States until 2013.

7.

When Christie moved back to Scotland, Christie knew there were unpaid taxes on the Property. In a decision he now surely

regrets, Christie left the care of the Property to a man named Craig Rosian.

## Rosian's Caretaking Duties

8.

Christie made loose arrangements with Rosian to care for and maintain the Property. Christie and Rosian, however, did not discuss the precise scope of Rosian's obligations. Rosian was a friend of Christie's and lived in the area.

9.

Christie assumed Rosian would pay any bills or taxes on the Property but did not leave Rosian any funds to do so. Both Christie and Rosian believed that Rosian was to have some role in collecting the mail and that Rosian was to notify Christie of any important developments with respect to the Property.

10.

During the trial, it became apparent that Christie's choice of Rosian as a screener of important mail and bills was ill-advised. Rosian has a very limited ability to read. During his trial testimony, he experienced profound difficulties in reading various documents presented to him by counsel. He was only ever able to decipher a few words.

AO 72A
(Rev. 8/82)

11.

The Court finds, based on Christie's testimony at trial, that Christie was not aware of Rosian's limited ability to read until the trial occurred.

12.

Christie repeatedly expressed his wholehearted confidence and trust in Rosian. That, too, proved ill-advised.

13.

After Christie's departure to Scotland, Rosian asked Christie if Rosian's daughter, Brittany Sink, and her then-fiancé, Kenneth Lewis, could live in the house on the Property. Christie agreed and thought it would be mutually advantageous because Christie believed that Sink and Lewis's presence would discourage vandals and thieves. Christie learned for the first time during trial that Rosian was charging his relatives to live on the Property and was secretly pocketing the money.

14.

Sink and Lewis lived on the Property from approximately May 2009 to April 2010. While living there, Sink and Lewis would collect mail addressed to Christie, Trade Antiques, and Border Boats. Border Boats was another business Christie was involved with and that had operated on the Property.

AO 72A
(Rev. 8/82)

15.

The testimony was, quite literally, "all over the place" as to the condition in which Sink, Lewis, and Rosian maintained the Property. Some witnesses testified that it remained neat and well kept. Others swore that there were drug paraphernalia and human feces throughout the house and that mail was scattered around the house or stuffed in large garbage bags.

**Tax Sale**

16.

On August 19, 2009, while Sink and Lewis lived on the Property, Christie was in Scotland, and Rosian was unable to read, Georgia Tax Servicing ("GTS") sent by certified mail a notice to the Property stating that the property taxes were delinquent.

17.

The certified mail was returned to GTS on September 10, 2009, as unclaimed and unable to forward.

18.

As a result of the unpaid property taxes, the Property was sold at a tax sale to Defendant Edward Canady on October 6, 2009, for $7,500.

19.

Delinquent taxes were owed on Lot 5A as well. However, the Tax Commissioner did not put Lot 5A up for tax sale.

AO 72A
(Rev. 8/82)

20.

Canady is an experienced tax-sale purchaser.  He has
purchased over thirty commercial and residential properties at
tax sales.

**Canady's Research Efforts**

21.

Prior to purchasing the Property, Canady desired to uncover
available information on Trade Antiques.  Information on Trade
Antiques and its members affected Canady's potential return on
his investment and, consequently, his decision whether to
purchase the Property at the tax sale.

22.

Prior to purchasing the Property at the tax sale, Canady
researched the Property in a computer database that gave the
Property's dimensions, its location, and a general description
of the features of the Property.

23.

Prior to purchasing the Property at the tax sale, Canady
looked at the deed book entry for the Property.  Unbeknownst to
Canady, Trade Antiques had misidentified itself as a Georgia—
rather than as a Florida—limited liability company.

24.

Prior to Trade Antiques acquiring the Property in 2003,
the Property was owned by James Crews.  Canady did not contact

either James Crews or the closing attorney, Bo Sweatt, to track down any more facts about Trade Antiques or to check whether Trade Antiques had been mistaken about its own state of organization.

25.

Prior to purchasing the Property at the tax sale, Canady spoke with someone at City Hall in the Finance Department who informed Canady that the Property was owned by a Mr. Christie and that he lived in Scotland, but no particular address was discovered.

26.

Prior to purchasing the Property at the tax sale, Canady researched the owners of the surrounding lots and discovered that Christie also owned Lot 5A, which is adjacent to Lot 6.

27.

Canady did not travel to Scotland or make other efforts to locate Christie's precise address in that foreign country.

28.

After purchasing the Property at the tax sale, Canady spoke with one of the neighboring landowners, Stanley Prince. Canady inquired into who owned the Property and what Prince knew of the owner. Canady also asked Prince about who was living on the Property.

29.

In the time frame shortly after the tax sale, Canady learned that someone was living on the Property because he observed a car parked on the Property and people in the area.

30.

Before this lawsuit was filed, Canady did not perform an Internet search for Trade Antiques or for Christie.

31.

When Canady attempted to foreclose the right of redemption, he believed that the prior occupants of the Property had moved out and that no businesses were currently operating on the Property. However, he believed that someone was still checking on and tending to the Property. He occasionally observed people on the Property. He also observed indications that people had been on the Property. He also observed that mail would be removed from the mailbox periodically.

32.

On the Property, there was an oval sign with the name "Border Boats" and a phone number that was inoperative during the relevant time frame.

33.

After this lawsuit was filed, Canady researched several online business reports for Trade Antiques, such as the Dunn &

Bradstreet reports.  Those reports did not have an address for Trade Antiques other than 2010 Osborne Road.

**Delivery and Publication of the Notice of Foreclosure**

34.

Canady published a Notice of Foreclosure in the Camden County newspaper, caused the Sheriff to serve a Notice of Foreclosure on 2010 Osborne Road, and personally mailed a Notice of Foreclosure by regular first-class mail to 2010 Osborne Road.

35.

Canady testified that he delivered the Notice of Foreclosure to the Sheriff's Office at least forty-five days prior to the redemption deadline of November 25, 2010.  However, the logged date recorded by the Sheriff's Office was October 29, 2010, which was a mere twenty-seven days prior to the redemption deadline.  As between the testimony of Canady and the documentary evidence, on this issue, the Court credits the documentary evidence.  The Sheriff's Office logged the Notice of Foreclosure within a few days of its receipt.  Accordingly, the Court finds that the Notice of Foreclosure was delivered to the Sheriff's Office for service on October 26, 2010, at the earliest, which was only thirty days prior to the redemption deadline.

36.

The notice served by the Sheriff's Office was served on November 1, 2010. No one was at the Property on the three occasions Officer Johnson attempted service, so he tacked the notice onto the front door.

37.

The Notice of Foreclosure Officer Johnson served by tack and mail was removed by either vandals or Rosian. If Rosian handled the Notice of Foreclosure, he would not have appreciated its contents due to his profound inability to read.

38.

Canady also mailed a copy of the Notice of Foreclosure by regular first-class mail to the address of the Property, 2010 Osborne Road. This mailing was addressed to Trade Antiques.

39.

The Notice of Foreclosure appeared in the Camden County newspaper on November 3, 2010, November 10, 2010, November 17, 2010, and November 24, 2010. The final publication was one day before the stated deadline for the owner to exercise the right to redeem.

40.

Specifically, the final publication ran on a Wednesday, and the stated redemption deadline was on Thursday, the following day.

41.

On February 23, 2011, Christie received a call from Rosian, who informed Christie for the first time that the Property had been sold at a tax sale to Canady. Christie thereafter informed his parents of the development. All three were very distraught over the information.

**Power of Attorney and Quitclaim Deed**

42.

Upon learning of the tax sale, Christie and his parents, the Jankovics, contacted Paul McCourt to help them deal with the situation. Paul McCourt was Christie's sister's boyfriend at the time.

43.

Christie and the Jankovics executed documents titled "Special Limited Power of Attorney" designating McCourt as having the authority to act on their behalf and in their place.

44.

The Special Limited Power of Attorney signed by Christie was part typewritten and part handwritten and appears as follows:

*I.T.A.O Andrew Christie 01786 475231*
*Mains Farm.*

STATE OF GEORGIA
COUNTY OF CAMDEN

## SPECIAL LIMITED POWER OF ATTORNEY

*ANDREW CHRISTIE*

KNOW ALL MEN BY THESE PRESENTS: That I, XXXXXXXXX, presently of *Mains Farm, Block3/ 2010 Osborne*, do hereby make, constitute and appoint PAUL McCOURT, presently of *PUERTO DE SECA SPAIN*, my true and lawful attorney, *AS LIMITED BELOW*, for me and in my name, place and stead, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in the premises as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or the substitute of my attorney may lawfully do or cause to be done by virtue hereof. A photocopy hereof shall be deemed an original for all purposes whatsoever.

This Power of Attorney shall not be affected by my disability. It is my wish and intent that the authority conferred by me upon my attorney through this General Power of Attorney should be exercisable notwithstanding my disability, my incapacity, a subsequent disability or incapacity or uncertainty as to whether I am dead or alive. All acts done by my attorney-in-fact or agent during any period of disability or incompetence or uncertainty as to whether I am dead or alive shall have the same effect and shall bind my heirs, legatees, devisees and personal representatives as if I were alive, competent and not disabled.

This Power of Attorney is specifically granted to allow my attorney-in-fact to act on my behalf regarding real estate located at 2010 Osborne Road, St. Marys, Camden County, Georgia, or any interest therein, now or formerly owned by me. It shall also specifically grant my attorney-in-fact the power to effect any and all transfers or dispositions of funds for or in connection with the same.

IN WITNESS WHEREOF, I hereunto set my hand and seal this 23 day of MARCH 20 11.

WITNESSES: A. Sheriff

Carola Ford.

On this 23 day of MARCH 20 11, personally appeared before me, a Notary Public in and for said State, the above-named principal, XXXXXXXXXXXXXXXX, who being duly sworn, executed the above General Power of Attorney as his/her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal, the day and year above written.

NOTARY PUBLIC
My commission expires:    n/a

WILLIAM GRAHAM CUNNINGHAM
STIRLING.

AO 72A
(Rev. 8/82)

45.

Around March 27, 2011, McCourt traveled to the United States with Christie's sister to investigate and to take action to recover 2010 Osborne Road.

46.

After three days of discussion, on April 1, 2011, Canady and McCourt entered into multiple transactions.

47.

On April 1, 2011, McCourt executed a quitclaim deed drafted by Canady.  The original Quitclaim Deed as signed by McCourt appears as follows:

RETURN TO:
Edward R. Canady
284 Deals Circle South
Woodbine, GA 31569

Please cross reference
To DB 1498 573

---

### Quitclaim Deed

This Quitclaim Deed made April 01, 2011, by Paul McCourt ("Transferor") with Power of Attorney (attached) on behalf of Andrew Christie, and Victor and Pearl Jankovic Mains Farm, Gargunnock, Stirling, Country of Scotland

to:

      Edward R. Canady ("Transferee")
      284 Deals Circle South
      County of Camden
      Woodbine, Georgia 31569

Transferor, in consideration of Seven Hundred Fifty and 00/00 Dollars ($750.00), the receipt and sufficiency of which is hereby acknowledged, remises, releases, and forever quitclaims to Transferee all of the interest of Transferor, if any, in and to that real property located in the County of Camden, and State of Georgia, and more certainly described as follows: All that lot, tract or parcel of land situate, lying and being in Camden County, Georgia and being more particularly described as the property of Trade Antiques, found at Map and Parcel S17 01 006, located at 2010 Osborne Road, St Marys, Georgia 31558.

To have and to hold, all and singular the described property, together with any improvements, and the tenements, hereditaments, abandoned property, and appurtenances belonging to such property, or in anywise appertaining, and the rents, issues, and profits of such property to Transferee, and Transferee's heirs and assigns forever.

IN WITNESS WHEREOF, Transferor has executed this Quitclaim Deed on the date first above written.

_____ (Transferor)
PAUL McCOURT

Page 1 of 2

AO 72A
(Rev. 8/82)

## Acknowledgment

State of GEORGIA      )
                          ) ss
County of CAMDEN    )

On this April 1, 2011, before me personally appeared Mr Paul McCourt, to me known to be the person described in and who executed the foregoing Quitclaim Deed and acknowledged to me that Paul Mc Court executed the same as his free act and deed.

_____
**Unofficial Witness**

                           Notary Public, State of Georgia
My commission expires: _____

Notary Public, Camden County, Georgia
My Commission Expires March 13, 2015

(NOTARY SEAL)

AO 72A
(Rev. 8/82)

48.

The original Quitclaim Deed as signed by McCourt stated that the Power of Attorney was "attached."

49.

Concurrent with the execution of the Quitclaim Deed, Canady gave McCourt $750.00 in cash, which McCourt accepted. McCourt thereafter signed a "Receipt of Funds," which stated that the $750.00 was "payment in full in connection with the issuance of a quitclaim deed pertaining to property located at 2010 Osborne Road, St. Marys, Georgia."

50.

Sometime later, Canady made the following alterations on the original Quitclaim Deed. He crossed out the word "attached" following "Power of Attorney." In addition, Canady inserted a handwritten alteration that read "further described as Lot 2 of Sauls Subdivision" after the description of the land to be conveyed. "Lot 2 of Sauls Subdivision" describes Lot 5A, not Lot 6. These alterations were done outside the presence of McCourt and everyone else ever connected to Christie or Trade Antiques.

51.

On April 1, 2011, McCourt also executed a warranty deed on behalf of the Jankovics and Andrew Christie for the adjacent lot Lot 5A, the lot owned by these three individuals.

52.

On April 1, 2011, Canady executed warranty deeds in favor of the Jankovics for two other residential properties.

53.

In summary, on April 1, 2011, Canady gave McCourt $750.00 in cash and warranty deeds to two residential properties. McCourt gave Canady a warranty deed to Lot 5A and a quitclaim deed to Lot 6 on behalf of the three individuals, Christie and his parents.

54.

McCourt made it clear to Canady that McCourt would continue to explore a final resolution to the ownership of Trade Antiques' property. He made it clear to Canady that he would continue to explore options to recover the property and would return to the United States to do so.

55.

On August 19, 2011, Melanie Marks, an attorney for Trade Antiques, sent a certified letter to Canady stating that Canady failed to comply with Georgia law regarding the bar of redemption and that Trade Antiques was exercising its right to

AO 72A
(Rev. 8/82)

redeem the Property by tendering the statutory amount required by Ga. Code Ann. § 48-4-47 (2014). That amount is $22,618.70.

## Credibility of Witnesses

### 56.

As previewed in the beginning of this Order, the Court found some of the witnesses and testimony in this case incredible. For that reason, the Court relies heavily on the documentary evidence.

### 57.

Canady was evasive and often unresponsive while cross examined. Portions of his testimony at trial directly contradicted his deposition testimony. When confronted with these inconsistencies, Canady gave no explanation and would feign ignorance or confusion at clearly stated and easy-to-understand questions.

### 58.

The Court finds portions of Christie's testimony incredible for completely separate reasons. Some of what Christie testified to was contrary to common sense at a maximum and naïve at a minimum.

### 59.

Mirroring his performance as a caretaker, Rosian's testimony was notably unreliable. Rosian was unable to recall the details or the timing of many of the events in question.

AO 72A
(Rev. 8/82)

He contradicted not only other people but also himself again and again. His contradictions were not even spaced apart— they would occur within a span of minutes and, on multiple occasions, within seconds.

60.

The other crucial witness, McCourt, testified by way of written deposition, so the Court had less of an advantage in measuring his credibility. His deposition testimony was, however, internally consistent and consistent with the documents.

## II. CONCLUSIONS OF LAW

## Reasonableness of Finding Christie's Address

1.

Plaintiff contests the reasonableness of Canady's efforts in locating Christie and Trade Antiques. The Court finds the efforts to be reasonable.

2.

The United States Constitution requires that the owner of property be provided "notice and opportunity for hearing" before property can be taken and sold for unpaid taxes. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). Absent any indication that notices by first-class mail and notices served by a sheriff were ineffective, a tax-sale purchaser is not required to take additional steps to locate an

alternate address for a party.  See Jones v. Flowers, 547 U.S.
220, 226 (2006); Hamilton v. Renewed Hope, Inc., 589 S.E.2d 81,
85 (Ga. 2003); H&C Dev., Inc. v. Bershader, 546 S.E.2d 907, 909
(Ga. Ct. App. 2001).

3.

In Jones, the United States Supreme Court held "that when
mailed notice of a tax sale is returned unclaimed, the [s]tate
must take additional reasonable steps to attempt to provide
notice to the property owner before selling his property, if it
is practicable to do so." Jones, 547 U.S. at 225. Jones
concerned a situation where the party seeking to give notice
"becomes aware prior to the taking that its attempt at notice
has failed." Id. at 227.

4.

Canady was unaware that Trade Antiques had failed to
receive actual notice of the attempted foreclosure. While
Canady believed that no one was currently living on the Property
and that no business was operating on the Property, he had
observed people on the Property. He also observed that someone
was collecting the mail. The Notice of Foreclosure tacked to
the front door was removed by someone. Accordingly, Canady was
not made aware that his attempt at actual notice was
ineffective. To the contrary, multiple objective signs showed
that it was effective.

5.

The methods of notice used by Canady were reasonably calculated to inform Trade Antiques of the Notice of Foreclosure.

6.

There did exist other possible avenues to find alternate addresses. However, an alternate address for Trade Antiques or for Christie was not reasonably ascertainable. Requiring Canady to explore multiple entries in a foreign countrywide telephone listing is not proper, nor is it reasonable for Canady to prepare open record requests to a county marshal for files in his desk that might contain an alternate address.

7.

It is true that during the time period immediately prior to Canady sending the notices of foreclosure, Canady could have obtained Christie's contact information in Scotland by speaking with Rosian.

8.

However, Canady acted reasonably by not speaking with Sink and Lewis while they lived on the Property to ascertain Trade Antiques' contact information. Canady had no reason to suspect

AO 72A
(Rev. 8/82)

they would disappear.  Their presence on the Property also indicated that letters mailed to the Property would be received.

9.

Likewise, Canady acted reasonably by not speaking with Rosian prior to sending the notices of foreclosure.  His periodic presence on the Property indicated that letters mailed to the Property would be received and in-person communication was unnecessary.  No one, not even Christie, could have anticipated the complete lack of care Rosian would exercise in handling the mail and every other aspect of the Property.

10.

It is true that Canady could have obtained Christie's e-mail address if he had pursued an open records request under Georgia law seeking the information in the City Marshal's possession concerning 2010 Osborne Road, Border Boats, or Andrew Christie.  However, because this information was only available with the City Marshal, this was not a required step for Canady to have taken in order to have acted reasonably.

11.

Trade Antiques' business reports to the State of Florida in the years 2002 and 2003 contained Christie's mailing address in Scotland.  However, it was Trade Antiques' error, not Canady's, that obscured that information.

12.

Although Christie is listed in the Scotland phonebook, if Canady had consulted it for the country of Scotland, he would have found numerous entries for the several Andrew Christies who live in that country.

13.

In short, Canady's efforts were sufficient, reasonable, and more than what was required to find Trade Antiques' address. His decision not to travel to Scotland or to initiate open records requests does not alter the Court's conclusion.

## Compliance with O.C.G.A. Sections 48-4-45 and 48-4-46

14.

O.C.G.A. Section 48-4-45(a)(3) requires that a notice of foreclosure

> be published, if that tax sale occurs on or after July 1, 1989, in the newspaper in which the sheriff's advertisements for the county are published in each county in which that property is located, which publication shall occur once a week for four consecutive weeks in the six-month period immediately prior to the week of the redemption deadline date specified in the notice.

Ga. Code Ann. §48-4-45(a)(3) (2014).

15.

Additionally, section 48-4-46(b) states that

> [t]he [tax sale] purchaser shall deliver the notice [of foreclosure of the right of redemption] and the

AO 72A
(Rev. 8/82)

> copies together with a list of the persons to be
> served to the sheriff of the county in which the land
> is located not less than 45 days before the date set
> in each notice for the expiration of the right to
> redeem.  Within 15 days after delivery to him, the
> sheriff shall serve a copy of the notice personally or
> by deputy upon each of the persons included on the
> list furnished him who reside in the county.

Id. § 48-4-46(b).

16.

As a preliminary matter, Canady contests Trade Antiques' ability to raise the issue of compliance with sections 48-4-45 and 48-4-46.  "[I]ssues not raised in the pleadings may be treated as if they were properly raised when they are 'tried by express or implied consent of the parties,' Federal Rule of Civil Procedure 15(b), or are included in the pretrial order." Steger v. Gen. Elec. Co., 318 F.3d 1066, 1077 (11th Cir. 2003); see also Diaz v. Jaguar Rest. Grp., LLC, 627 F.3d 1212, 1214 (11th Cir. 2010) ("Federal Rule of Civil Procedure 15(b) 'permits amendments to the pleadings even after judgment if the issues involved are tried by the express or implied consent of the parties.'" (quoting Combee v. Shell Oil Co., 615 F.2d 698, 701 (5th Cir. 1980)).

17.

The Court concludes that the issue of whether Canady complied with sections 48-4-45 and 48-4-46 was raised in the Proposed Pretrial Order, Dkt. No. 41.  Trade Antiques cited

those code sections in the Proposed Pretrial Order and made clear that Canady's failure to provide adequate notice was a focus of Trade Antiques' case. Thus, the issue is properly before the Court.

18.

In the present case, the final publication in the Camden County newspaper was on Wednesday, November 24, 2010. The Notice of Foreclosure listed the following day, Thursday, November 25, 2010, as the final day to redeem the Property.

19.

Under Georgia law, the language "once a week for four consecutive weeks in the six-month period immediately prior to the week of the redemption deadline date specified in the notice" found in section 48-4-45(a)(3) prohibits a final publication in the same calendar week as the redemption deadline date specified in the notice. See § 48-4-45 (a)(3).

20.

In interpreting similar statutory language, the Georgia Supreme Court has held that "the last publications must precede in point of time the week embracing the day on which the act stated in the notice is to be done." Bracewell v. Warnock, 67 S.E.2d 114, 116 (Ga. 1951); see also Conley v. Redwine, 35 S.E. 92, 92 (Ga. 1900). In Bracewell, the court interpreted a Georgia constitutional

AO 72A
(Rev. 8/82)

provision requiring that a bill be published "once a week for three weeks during a period of sixty days immediately preceding its introduction into the General Assembly." 67 S.E.2d at 115 (quoting Ga. Const. of 1945 art. III, § 7, para. 15). In interpreting that language, the court found that a bill was improperly introduced on Wednesday, February 7, because the third and final publication ran on Monday, February 5, which was just two days prior and within the same calendar week. Id. at 116-17. The court stated that "the bill could not have been legally introduced before February 12," which would have been the following Monday. Id. Likewise, in Conley, the sheriff published the final notice for a sheriff's tax sale on Monday, April 5, and the tax sale took place the following day, Tuesday, April 6. 35 S.E. at 93-94. The applicable sections of the civil code required that "notices of all sales by the sheriff . . . be published weekly for four weeks" and provided that it was sufficient to publish the notice "once a week for four weeks . . . immediately preceding the day when the sale . . . [was] to take place." Id. at 93. The court stated that

> [t]he week in which the sale takes place is certainly not a week "preceding" the day on which the sale takes place; and it would, therefore, follow that the notice

published in such week could not be counted as one of
the four insertions necessary to a compliance with the
statute.

Id. at 94.  The court therefore concluded that, because the
final publication ran the Monday prior to the Tuesday tax
sale, the sale was not properly advertised.  Id.

21.

Because the final publication occurred the same week as the
listed redemption deadline, Canady failed to comply with section
48-4-45(a)(3).  The "six-month period immediately prior to the
week" of the redemption deadline did not include Wednesday,
November 24, 2010.

22.

Accordingly, this Court holds that Canady failed to comply
with section 48-4-45(a)(3) because the final publication in the
Camden County newspaper occurred during the same week as the
redemption deadline.  "It is well settled that because the
forfeiture of the right of redemption is so harsh, the law
favors the redeeming property owner."  H&C Dev., Inc., 546
S.E.2d at 908.  "As such, the laws of [Georgia] governing the
right to redeem are to be construed liberally and most favorably
to persons allowed by the statute to redeem."  Id. at 908-09
(citations omitted) (internal quotation marks omitted).

AO 72A
(Rev. 8/82)

23.

Canady also failed to comply with section 48-4-46(b) and did so in two ways: (1) Canady did not deliver the Notice of Foreclosure to the Sheriff forty-five days prior to the day of redemption, and (2) the Sheriff did not serve the notices on the Property thirty days prior to the day of redemption.

24.

In Dixon v. Conway, the Georgia Supreme Court held that if a person entitled to notice was not served by the sheriff at least thirty days prior to the listed redemption deadline, "the bar of redemption must be set aside." 425 S.E.2d 651, 652 (Ga. 1993). The court stated that "persons on the list [provided by the tax-sale purchaser] are entitled to receive notice of the foreclosure of the right to redeem at least thirty days in advance of the final date." Id. If thirty days' notice was not given, the party was entitled to redeem the property because laws governing the redemption of property sold at tax sale "are to be construed liberally and most favorably to persons allowed by the statute to redeem." Id.

25.

Canady's attempted foreclosure of Trade Antiques' right of redemption was ineffective because the Notice of Foreclosure was not delivered to the Sheriff for service forty-five days prior to the redemption deadline and the Sheriff did not serve the

Notice of Foreclosure thirty days prior to the redemption deadline.

26.

Because Canady failed to properly comply with the notice provisions, his attempted Notice of Foreclosure was ineffective, and the bar of redemption must be set aside.

## Effect of the Power of Attorney and Quitclaim Deed

27.

Canady claims that even if he did not acquire the Property through foreclosure, he acquired it by quitclaim deed or by settlement, accord and satisfaction, or other equity principles.

28.

Under section 14-11-701(a) of the Official Code of Georgia, Florida law governs Christie's authority to act on behalf of and to bind Trade Antiques, a Florida limited liability company. See Ga. Code Ann. § 14-11-701(a) (2014). Section 14-11-701(a) states as follows:

> The laws of the jurisdiction under which a foreign limited company is organized govern its organization and internal affairs and the liability of its managers, members, and other owners, regardless of whether the foreign limited liability company procured or should have procured a certificate of authority under this chapter.

Id.

29.

Under section 608.4235 of the Florida Statutes, any member
of a limited liability company "may sign and deliver any
instrument transferring or affecting the limited liability
company's interest in real property," "[u]nless the articles of
organization or operating agreement limit the [member's]
authority."  Fla. Stat. § 608.4235(3) (2014).

30.

As the sole member of Trade Antiques, Christie had the
authority to transfer Trade Antiques' interest in the Property
and to transfer that authority to do so to McCourt.

31.

What is less clear is whether the instant Power of Attorney
did transfer to McCourt any power to ever act on Trade Antiques'
part.  The Power of Attorney appointing McCourt to handle the
real estate located at 2010 Osborne Road is ambiguous due to the
placement of the handwritten insertions.  Reasonable arguments
can be made that only Christie, individually, is giving a power
of attorney, only Trade Antiques is giving a power of attorney,
or both are giving a power of attorney.  Looking at the four
corners of the document, it is not clear.  Both Christie,
individually, and Trade Antiques, as an entity, own different
lots at 2010 Osborne Road.  No seal or other representative
nature is indicated on the signature line.  Looking at extrinsic

evidence and utilizing the rules of construction, it is clear, that all parties understood that pursuant to the Power of Attorney McCourt had the power to bind Christie personally and Trade Antiques. That is the reading that would give full effect to the document. It is consistent with a rational reading of the document. All parties proceeded as though the document entitled McCourt to act on Christie's individual behalf. McCourt's credible testimony confirms that the power of attorney enabled him to handle the affairs of Christie individually and Trade Antiques. Therefore, the wording and context of the Power of Attorney leads the Court to conclude that Christie executed the Power of Attorney as an individual and as the sole member of Trade Antiques.

32.

Based on the above language, the Power of Attorney executed by Christie bestowed upon McCourt discretion to take any action on behalf of Trade Antiques that Christie himself would have been empowered to take, to take any action on behalf of Christie personally, or to act on behalf of both. However, it does not mandate that he act on behalf of one or both, as to any particular transaction, but it does give McCourt power to do so.

33.

While Canady is correct that McCourt had the power of attorney to act on behalf of Christie, the Jankovics, and Trade

Antiques, Canady is incorrect in his contention that the Quitclaim Deed shows McCourt exercised his powers on behalf of Trade Antiques.

34.

Trade Antiques challenges the validity of the Quitclaim Deed based, in part, on post-execution alterations. Under Georgia law, if a deed is altered after its execution, such as here, the altered portion is not binding on the other party unless the altered deed is resigned or reattested. Z & Y Corp. v. Indore C. Stores, Inc., 638 S.E.2d 760, 768 (Ga. Ct. App. 2006) (quoting Citizens' Bank of Moultrie v. Taylor, 149 S.E. 861, 864 (1929)); see also Ga. Code Ann. § 13-4-1 (2014).

35.

Absent an intent to defraud, the Court should enforce the originally executed contract if possible. Here, it is an impermissible stretch to find a lack of fraud. Canady altered the Quitclaim Deed. He admitted that in his sworn deposition. During trial, he changed his testimony and claimed not to know how the alterations occurred.

36.

The alterations attempted by Canady provide clarity to the deed by giving meaningful detail as to which part of 2010 Osborne Road was transferred. However, the alterations provide a clarity that was not agreed upon, in writing, by McCourt.

37.

The deed provides even higher hurdles for Canady.  It references the Power of Attorney as being attached, but the Court is unable to determine if it ever was.  Crucially, it refers only to Christie and the Jankovics individually but nowhere indicates that McCourt—in executing the Quitclaim Deed—is acting on behalf of Trade Antiques.  Further, in the Quitclaim Deed, Trade Antiques does not purport to give or gain anything.  No consideration flows from or to Trade Antiques.  Nothing indicates that Trade Antiques received $750.00.  The credible evidence shows that any consideration was paid only to the individuals.

38.

Nothing about the Quitclaim Deed stands as a settlement agreement or release as to Trade Antiques.[1]

39.

Trade Antiques is simply not identified as a participant in the deed.  Nor does the Quitclaim Deed identify Christie, the Jankovics, or McCourt as acting on Trade Antiques' behalf as to the Quitclaim Deed.

---

[1] Trade Antiques understandably identifies multiple other deficiencies in the Quitclaim Deed, such as the lack of a corporate seal.  For present purposes, it is enough to identify the above-mentioned grounds that prohibit the document from settling the dispute or transferring Trade Antiques' property to anyone.

40.

Such a conclusion is consistent with the deposition testimony of McCourt, who testified that no complete resolution or settlement had been reached as to 2010 Osborne Road. There is certainly no evidence that McCourt acted for anyone but his individual principals in signing the Quitclaim Deed.

41.

Canady is not entitled to prevail on the defenses of estoppel, payment, waiver, or accord and satisfaction.

42.

Finally, Canady has raised the equitable doctrine of unclean hands in an attempt to change the result. Because both parties could benefit from hand soap, no such change in the result is warranted.

**Counterclaim**

43.

Canady filed a counterclaim seeking to recover certain funds expended in purchasing the Property at the tax sale, property taxes paid on the Property, and the applicable premiums. Canady also seeks reimbursement for sums he expended in order to improve the value of the Property.

Canady is entitled to prevail on part of his counterclaim. He is entitled to recover the redemption amount pursuant to O.C.G.A. §48-4-42. However, Canady has offered insufficient proof regarding his further request to be paid for property improvements. He has not provided sufficient proof as to what he has expended and how it has improved the property or increased its value. Accordingly, that portion of his counterclaim must be denied.

## CONCLUSION

Based on the foregoing, Trade Antiques is entitled to a Declaratory Judgment in its favor. The bar of redemption must be set aside. Canady is entitled to receive $22,618.70 as the statutory redemption price.

**SO ORDERED**, this 30TH day of September, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA